Maurice J. Breen and Alyce Breen v. Commissioner.
Breen v. Commissioner
Docket No. 85016.
United States Tax Court
T.C. Memo 1962-230; 1962 Tax Ct. Memo LEXIS 78; 21 T.C.M. (CCH) 1228; T.C.M. (RIA) 62230; September 28, 1962
*78 In 1930 the major creditors of an estate agreed to a plan which transferred certain coal-bearing estate property to a corporation whose stock was held in trust as security for the payment of the creditors' claims. Each creditor received a "Trustee's Certificate" representing his claim, plus 6 percent interest. Petitioner purchased two of these certificates in 1954 for $2,650 and received payments from the trust of $8,258 in 1955 and $13,334.41 in 1956. The trust was terminated in 1956. Held, the gains realized from the payments made to petitioner in 1955 and 1956 on his certificates did not result from a sale or exchange of such certificates and are therefore taxable as ordinary income. Held, further, a payment of a fee in 1955 of $4,200 to petitioner by a corporation for his general services as a director and executive officer over a period of more than 20 years was not received in "an employment" within the meaning of section 1301(b) and, therefore, petitioner is not entitled to the benefit of section 1301. Held, further, adjustments made in deductions claimed by petitioner for automobile expenses and medical expenses. Maurice J. Breen, Esq., pro se, 925 Second Ave. S., Fort Dodge, *79 Iowa. David A. Pierce, Esq., for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: The respondent determined deficiencies in the petitioners' income tax for the years 1955 and 1956 in the amounts of $278.33 and $4,835.30, respectively. The issues are (1) whether petitioners are entitled to attribute a $4,200 fee received in 1955 to prior years under section 1301 of the Internal Revenue Code of 1954; [1] (2) whether petitioners are entitled to capital gains treatment on the gains realized from the retirement of certain trust certificates; (3) whether respondent correctly disallowed a portion of the automobile expenses deducted by petitioner in 1955 and 1956; and (4) whether respondent correctly disallowed a portion of the medical expense deductions claimed by the petitioners in 1955 and 1956. Findings of Fact Some of the facts were stipulated and they are found accordingly. Maurice J. Breen and Alyce Breen, husband and wife, are residents of Fort Dodge, Iowa. They filed their joint income tax returns for the years 1955 and 1956 with the district director *80 of internal revenue at Des Moines, Iowa. Maurice J. Breen will hereinafter be called the petitioner. Petitioner was appointed executor and testamentary trustee under the will of W. N. Merritt, who died on May 7, 1928. The estate owned an interest in two tracts of land near Des Moines, Iowa, each tract consisting of 110 acres. The estate held an undivided one-half interest in one of the 110-acre tracts, and an undivided one-fourth interest in the other 110 acre tract. Both of these tracts were mortgaged and both were subject to coal leases. The estate also owned an interest in about 80 acres of land, also mortgaged, near Fort Dodge, Iowa. The assets of the estate were not sufficient to meet the substantial claims of decedent's creditors. On September 22, 1930 the major creditors, together with the beneficiaries under the will, executed a trust agreement which provided in part as follows: As a preamble to the powers and authority granted to and by this instrument vested in the Trustee, hereinafter named and its successor or successors and in order to define the trust herein created, the parties hereto recite the following facts: * * *
3. Those of the undersigned who are creditors of *81 said estate deem it to their advantage that through the medium of a trustee whose selection is approved by them, the plan hereinafter outlined for the purchase and disposition by the trustee of property of the estate be put into effect; the title to the property the trustee is herein empowered to purchase to be taken in the name of said trustee; the purchase price to be paid as authorized in the order of sale of the District Court of Webster County by the surrender and release of the claims of the undersigned estate creditors in payment for the property. Said trustee to be herein authorized and empowered to convey certain interests in real estate hereinafter described to a corporation the "Urbandale Coal and Acreage Company", in exchange for stock in said corporation, and to hold said stock as trust property and as security for notes evidencing the amount of present indebtedness of creditors of said estate, and to apply the dividends and income from the said stock (and other stock) to the payment of interest and the liquidation of the principal amount of said indebtedness. * * * 5. The parcels of real estate said trustee is herein empowered to purchase at Executor's sale and the rights *82 connected with and appurtenant to said real estate are described as follows: Tract No. 1. An undivided one-half interest in and to the East 110 acres of the North 220 acres of the East one-half of Section 26, Township 79, North of Range 25, West of the Fifth P. M., Polk County, Iowa, encumbered by a mortgage of $11,000.00. Tract No. 2. An undivided one-fourth interest in and to the West 110 acres of the North 220 acres of the East one-half of Section 26, in Township 79, North of Range 25, West of the Fifth P. M., Polk County, Iowa, except one acre out of the Northwest part of said described tract, encumbered by a mortgage of $8,000.00. Both of said tracts are subject to coal leases (the said estate owning the interest of W. N. Merritt as one of the lessors therein) granting to the lessee the exclusive right to mine and remove the coal underlying said above described tracts of real estate, which leases run to Harvey Blount lessee and have been assigned to the Central Service Company of Des Moines, Iowa. * * *
6. Said Corporatiton, "Urbandale Coal and Acreage Company" has heretofore been incorporated under the statutes of the State of Iowa to take and hold upon the approval of the Executive *83 Council of Iowa and the fixing of a valuation therefor, the title to said described real estate; and it is expressly understood that contemporaneous with the transfer to the corporation of the interest of the estate, there shall be vested in said corporation a like undivided share and interest owned by D. M. Kelleher (who owned an equal interest with the said W. N. Merritt). All the interests of the Estate of D. M. Kelleher shall be transferred to said corporation in exchange for such amount of preferred and (no par) common stock of said corporation, as shall be authorized by the executive council of Iowa. It is expressly understood that when said plan shall be consummated said trustee shall receive the same number of shares respectively of said preferred and common stock as are received by said D. M. Kelleher for equal interests in the property transferred to the corporation. Said trustee shall also purchase from the said Executor certain corporate stocks consisting of seventeen (17) shares of the common stock of the First National Company of Fort Dodge, Iowa. 7. The following claims of the undersigned creditors against said Estate of W. N. Merritt shall be satisfied and released *84 by payment as part of the purchase price of the property to be so purchased from said Executor with interest computed to September 1, 1930, to-wit: First National Bank
$12,923.92
Doris O. Merritt
7,652.15
Margaret Merritt
1,500.00
Olive Seay
569.17
Edna Richardson
1,050.00
Katherine & Bridget Carey
3,875.46
It is the intention of the parties to this instrument that said trustee, the First Trust & Savings Bank of Fort Dodge, Iowa (or its successor) shall, when this plan is carried into effect, hold all of the said certificates of stock in Urbandale Coal and Acreage Company, and the First National Company, as security for the claims of said above described creditors until the whole amount of the said above enumerated debts with interest thereon are paid in full, and thereafter hold the same for distribution to and shall promtly distribute the same to the beneficiaries under the will of said W. N. Merritt in the proportions they are entitled to share in the Estate of the said testator. * * *
TRUST AGREEMENT AND DECLARATION * * * it is hereby stipulated that the trustee shall have and possess authority and powers as follows: 1. To purchase from Maurice J. Breen as Executor of the Estate of W. N. Merritt, *85 deceased, the corporate stocks and parcels of real estate specifically described in the preamble to this instrument and to pay the purchase price therefor in the manner therein designated and expressed, viz.: by surrendering, discharging and releasing the several claims of the First National Bank, Doris O. Merritt, Margaret Merritt, Olive Seay, Edna Richardson, Katherine Carey and Bridget Carey, and by executing the requisite contracts, vouchers and other instruments to evidence such discharge, satisfaction and release of said claims in consideration of the application of the amount thereof upon the purchase price by said Trustee bid for said property. * * *
3. After the consummation of said plan and issuance to the said trustee of shares of the stock of said Urbandale Coal and Acreage Company, to make and execute such notes and instruments to the several above named creditors of the estate of W. N. Merritt for the amounts of their respective obligations as hereinbefore enumerated with interest thereon from September 1, 1930 at the rate of 6% per annum, payable semi-annually and with the option of said trustee to pay from time to time any moneys in his hands derived from the trust property *86 in liquidation of said debts, said trustee to be authorized to execute any appropriate pledge to assure said creditors that said corporate stocks are held by said trustee as security for the benefit pro rata of said several creditors. 4. The income and dividends accruing upon all stocks (or other income bearing property or assets constituting the trust property or derived therefrom) shall be applied by said trustee as follows: First, to pay all current interest accruing upon the claims of said creditors; second, the surplus, if any remains above said interest, to be applied pro rata to the liquidation of the principal of said obligations. At least annually on September 1st of each year, the entire balance above requirements for interest shall be so applied and paid pro rata upon the principal of said obligations. The trust agreement named the First Trust and Savings Bank of Fort Dodge, Iowa as trustee, but within a few months this bank closed and was subsequently liquidated, and it was succeeded by the First State Bank & Trust Company of Fort Dodge. This second bank issued and signed the trust certificates distributed to the several creditors of the Merritt estate. When the second *87 bank failed in 1934 it was succeeded by The State Bank of Fort Dodge, Iowa, which is still operating and was the trustee at the time of liquidation of the trust. Trust certificates were issued to the following creditors of the Merritt estate: Amount of
Creditor
Claim
First National Bank of Fort Dodge,
Iowa
$12,923.92
Doris D. Merritt
7,652.15
Margaret Merritt
1,500.00
Olive Seay
569.17
Edna Richardson
1,050.00
Katherine and Bridget Carey
3,875.46
The trustee's certificate issued to the First National Bank of Fort Dodge, Iowa, which is representative of the certificates issued to the other creditors, stated in part, as follows: TRUSTEE'S CERTIFICATE This certifies that the First National Bank of Fort Dodge, Iowa, is the owner of a.4666 of the equitable ownership and beneficial interest in seventeen (17) shares of the preferred stock and seventeen and one-half (17 1/2) shares of the common stock of the First National Company of Fort Dodge, Iowa, thirty-five (35) shares of the capital stock of the First National Bank of Fort Dodge, Iowa, two hundred and fifty (250) shares of the preferred stock and two hundred and fifty (250) shares of the common stock of the Urbandale Coal & Acreage Company of Fort *88 Dodge, Iowa, title to which certificates of stock is held by the First State Bank & Trust Company of Fort Dodge, Iowa, as trustee for the benefit of the holder or holders of this certificate and all similar certificates issued or to be issued by the trustee to evidence ownership of said beneficial interest in said property sold held by it in trust. All of said certificates are issued or are to be issued under and in pursuance of an agreement, declaration of trust and appointment of attorney-in-fact in which said property is more specifically described and the agreements of the trust specifically set forth, dated September 22nd, 1930. The parties to said agreement, declaration of trust and appointment of attorney-in-fact being certain of the creditors of the Estate of W. N. Merritt, deceased, the beneficiaries under the will of the said W. N. Merritt, deceased, and the executor and testimentary [testamentary] trustee under the will of W. N. Merritt, deceased, together with the undersigned trustee. To which agreement, declaration of trust and appointment of attorney-in-fact reference is hereby made for a statement of the rights of the holders of this certificate and all other certificates *89 issued under the declaration of trust in said property and the terms and conditions of said trust. The trustee agrees that it will pay to the registered holder of this certificate on the first day of March and the first day of September of each year said holder's pro rata share of the net proceeds which may be derived from the dividends of the above described stock constituting the trust estate. This certificate represents a claim of $12,923.92, which sum is to draw interest at the rate of 6% per annum to be computed March 1st and September 1st of each year and all of that portion of the sums paid by the trustee on said dates in excess of the interest then due shall be endorsed upon the principal of said claim and when said interest and principal have been paid in full through the disbursements of said trustee, then this certificate shall have no more value. Whenever in the declaration or in this certificate the trustee is obligated to pay or distribute any sum of money to the holder thereof, it is understood that all such obligations are undertaken by it in its trust capacity only and not personally and that such payments and distributions are to be made only out of such funds as *90 the trustee has in its hands available therefor. Subject to the terms and conditions of the declaration of trust and appointment of attorney-in-fact this certificate and the interest represented thereby may be assigned and transferred upon the books of the trustee by the holder hereof in person or by duly authorized attorney, upon surrender of this certificate duly assigned, and the transferee shall by accepting this certificate or any certificate which may be issued in place hereof, become a party to the declaration of trust and appointment of attorney-in-fact and be bound thereby and entitled to all rights thereunder. Pursuant to an agreement dated October 5, 1933 Lena Chelstad purchased for the sum of $8,567.03 the trustee's certificate which had been issued to the First National Bank of Fort Dodge, Iowa. On April 5, 1954 the petitioner purchased from the estate of Lena Chelstad the trustee's certificate representing the.4666 interest in the trust for the sum of $2,500. On April 12, 1954 petitioner purchased for $150 the trustee's certificate originally issued to Edna Richardson and representing a.0384 interest in the trust. The Urbandale Coal & Acreage Company, which was organized *91 by petitioner and D. M. Kelleher, operated, through a working mining company, a coal mine on this land on a royalty basis, until 1947. During this entire period the petitioner was president of the corporation, D. M. Kelleher was vice president, and Mary S. Kelleher was secretary-treasurer. Petitioner and the Kellehers were also the directors of the corporation during its entire existence. Shortly after the coal ceased to be mined in 1947 the petitioner, as president of the Urbandale Coal & Acreage Company, began to seek purchasers for the land held by the corporation. On December 29, 1952 the beneficiaries of the estate executed a quit claim deed for the property which had been transferred to the corporation. Late in the year 1954 the corporation sold both tracts of land to the Benton Development Company for a total consideration of $125,000. During the month of December 1954 the Urbandale Coal & Acreage Company adopted a resolution to liquidate. On March 9, 1955 at a special meeting of the stockholders of Urbandale Coal & Acreage Company a resolution was adopted authorizing payment of a fee of $4,200 to petitioner and a fee in the same amount to Mary S. Kelleher. The resolution stated, *92 in part, as follows: WHEREAS, the Urbandale Coal & Acreage Company is now in the process of liquidation, and throughout its corporate existence of more than twenty-four years no compensation was ever paid to any of the officers or directors of said corporation; * * *
BE IT NOW RESOLVED: (1) That the said Maurice J. Breen and Mary S. Kelleher, each, be allowed the sum of $200.00 a year for their services as directors, and their services in attending board meetings and committee meetings, and other incidental work connected with the management of said corporation. (2) That said allowance extend over the first twenty-one years of the life of this corporation, as said twenty-one years covers the active operation of this corporation while it was engaged in the production of coal, and that said allowance to each of said named directors, to wit, Mary S. Kelleher and Maurice J. Breen, be in the sum of $4,200.00 each. (3) That Maurice J. Breen, as president of the corporation and the liquidating agent of said corporation, be authorized and directed to pay to Mary S. Kelleher, and to himself, the sum of $4,200.00 each for their services as directors of said corporation over a period of twenty-one *93 years, in which time they had substantially no personal interest in the company, or in its profits. Except for the payment of a $500 legal fee for legal services performed for the Urbandale Coal & Acreage Company the petitioner received no other compensation from the corporation during the years 1931 through 1955 other than the $4,200 which was received by him in 1955. Petitioner received payments of $8,258.88 in 1955 and $13,334.41 in 1956 from The State Bank of Fort Dodge, Iowa, trustee of the creditors' trust, to be applied to the two trustee's certificates purchased by petitioner in April 1954. These payments were made in liquidation of the creditors' trust. During the period from September 29, 1931 to January 16, 1956 the trust paid a total of $58,296.03 to the creditors. These payments represented receipts by the trustee of dividends from the operation of the Urbandale Coal & Acreage Company as well as the final liquidating dividends from the corporation. In the final report of The State Bank, Fort Dodge, Iowa, trustee of the creditors' trust, dated January 20, 1956, there appears the following: That by reason of the operation of the Urbandale Coal & Acreage Company, while in *94 the production of coal, and the subsequent sale of the tracts, a great deal more has been paid to the trustee than the amount of the claims; that the said claims as originally filed were as follows: First National Bank
$12,923.92
Doris O. Merritt
7,652.15
Margaret Merritt
1,500.00
Olive Seay
569.17
Edna Richardson
1,050.00
Katherine and Bridget Carey
3,875.46, or a total of $27,570.70, and that on said claims there has been paid to the trustee the sum of $58,664.34; however, said claims, as they were set up at the time of the trust, drew interest at 6% per annum, payable semiannually on the first day of March and first day of September of each year, and that the interest accumulations have been such that, notwithstanding the large amounts that have been paid, the unpaid claims at this time, or the total amount of the debt set up in said trust, is in the sum of $27,018.71; that under the terms of said trust, the beneficiaries of the estate of W. N. Merritt received no part of the assets in said trust, or the proceeds thereof, until the claims of the creditors had been paid; with interest, and therefore all of the money collected has been distributed to the claimants. * * *
Your trustee further *95 states and shows that it has in fact been more or less nothing but an assignee of certain assets for the benefit of creditors; in fact, that was the only purpose of the contract, and that everything has been realized that can be realized out of the assets, and the claimants have received all of the money except a small charge made by the socalled trustee as hereinbefore set out, and the said trustee is making a final closing charge of $50.00, and said trustee is further paying an expense of $25.00 to one David Crenshaw of Des Moines, Iowa, who acted in connection with the sale of the real estate, and who has been fully paid except for this small item. On January 27, 1956 the District Court of the State of Iowa (Webster County) entered a final order closing the trusteeship. Petitioner received the following payments for his services as executor of the estate of W. N. Merritt and as trustee for the beneficiaries of said estate: Date
Item
Paid By
Amount
8/ 1/28
Special Administrator fees
Estate
$ 250.00
9/ 2/30
Part payment for executor and attorney fees
Estate
914.65
2/20/30
Attorney and executor fees
Estate
543.36
3/ 2/31
Attorney and executor fees
Estate
2,000.00
7/ 1/30
Fees as trustee and attorney
Trusteeship
400.00
9/27/34
Fees as trustee (4 years) to 11/25/35
Trusteeship
1,000.00
12/31/41
Attorney fees to Breen, Breen, and McCormick
Trusteeship
1,042.08
2/ 8/40
Fees as trustee - 2 years 11/25/35 to 11/25/37
Trusteeship
500.00
2/25/42
Fees as trustee - 4 years 11/25/37 to 11/25/41
Trusteeship
1,000.00
10/ 6/45
Fees - 11/25/41 to date
Trusteeship
5,000.00
11/26/45
Part payment of fees - 1/15 interest in Gypsum 80 acres
Trusteeship
Property
Petitioner *96 has been engaged in the practice of law in Fort Dodge, Iowa for about 40 years. During the years 1955 and 1956 the petitioner owned or had a partial interest in six farms. He also had an undivided one-fourth interest in 10 acres of land in Texas; a one-fourth interest in 10 acres of land in Mississippi; a one-half interest in about 40 acres of land in Montana; and a tract of land in Arkansas. Petitioner reported no income from the Arkansas, Mississippi and Montana tracts in 1955 and 1956; he reported net receipts of $96.93 from the Texas land in 1955 and $17.65 in 1956. During the years 1955 and 1956 petitioner and his family went on vacation practically all summer and made automobile trips to such places as Canada, Montana, Arkansas, Mississippi and Texas. Petitioner estimated that he used his car 75 percent for business purposes and on his returns for 1955 and 1956 claimed deductions of $2,987.09 and $2,068.63, respectively, for automobile expenses. Respondent disallowed $2,532.03 and $1,520.50 of the deductions claimed in 1955 and 1956, respectively, with the explanation that "it has not been established that more than 25 percent of the expenses incurred in the operation of your *97 automobiles constitutes ordinary and necessary business expenses * * *" Petitioner was 72 years of age at the time of the trial. During the years 1955 and 1956 petitioner paid insurance premiums to the following companies in the following amounts: Insurance Company
Policy No.
1955
1956
1. Commercial Ins. Co.
Certificate under Group Dis-
$124.50
$190.17
ability Policy No. GZ 1001
2. Continental Cas. Co.
851550
141.00
121.00
3. Continental Cas. Co.
858437
175.70
192.80
4. Auto Owners Ins. Co.
H 48062
82.00 The first policy insured petitioner as a member of the Iowa State Bar Association, which association had a group accident and health policy from the Commercial Casualty Insurance Company. Under the policy petitioner was insured against death, dismemberment, or loss of sight, speech or hearing due to injuries caused solely by an accident. A schedule fixed the amounts of specific indemnities for the several types of losses or disabilities. The policy also provided for (1) a weekly indemnity, not exceeding a fixed period, for total loss of time caused by accidental injuries; (2) a weekly indemnity, not exceeding a fixed period, for total loss of time caused by sickness; (3) payment of expenses for medical *98 treatment of minor injuries in an amount not exceeding the weekly indemnity for one week; (4) hospital expenses and surgical expenses, with prescribed maximums; and (5) an indemnity for any loss specified in the policy resulting from injuries caused by air travel. The second policy provided for accident or sickness benefits. It insured petitioner against loss of life, dismemberment, or loss of sight, due to injuries caused solely by an accident, with specific indemnities for the various losses or disabilities. The policy also provided for a monthly indemnity for loss of time due to total disability resulting from accidental injuries, with reduced indemnities in the event of partial disability. The policy provided for a monthly indemnity for loss of time as a result of total disability and confinement due to sickness, with a reduced monthly indemnity in the event of partial disability. In addition, the policy provided for (1) a monthly hospital indemnity, (2) physician's expenses for nondisabling accidents, and (3) a double indemnity for certain specific accidents. The third policy was a family hospital expense policy which insured petitioner, his wife and their three minor children. *99 The premium rate under the policy attributable to the children was $19.10 for each child. The policy covered hospital board and room and miscellaneous expenses, and it also provided for certain surgical operations. The fourth policy, which insured petitioner, his wife and their three minor children, provided "benefits for loss due to hospital confinement and for other specified expense resulting from accidental bodily injury and sickness, to the extent herein limited and provided. " The policy also provided indemnities for hospital and other expenses resulting from poliomyelitis. Petitioner claimed deductions for medical expenses of $804.52 in 1955 and $866.23 in 1956. These amounts included insurance premiums paid on the several policies held by petitioner. Respondent disallowed $316.77 of the medical deduction in 1955 with the following explanation: It is determined that you are entitled to a deduction for medical expense of $487.75 in lieu of $804.52 claimed on your return. Taxable income is thereby increased by $316.77 resulting from disallowance of purported health and accident insurance premiums of $302.22 [this represents 60 percent of the insurance premiums paid on the three *100 policies listed earlier in our findings of fact, plus a $37.50 premium on a comprehensive personal liability policy] which constitute nondeductible personal living expenses, disallowance of medical expenses of $55.80 incurred for dependents which are not deductible by reason of the limitations applicable to medical expenses paid for dependents, allowance of medical expense of $7.09 not previously deducted on the return * * * and allowance of $34.16 deductible by reason of the limitations applicable to payments for medicine * * *. Respondent also disallowed $457.95 of the medical deduction in 1956 with the following explanation: It is determined that you are entitled to a deduction for medical expense of $408.28 in lieu of $866.23 claimed on your return. Taxable income is thereby increased by $457.95 resulting from the disallowance of purported health and accident insurance premiums of $238.16 which constitute nondeductible personal living expenses, disallowance of medical expenses of $55.80 incurred for dependents which are not deductible by reason of the limitations applicable to medical expenses paid for dependents, disallowance of excessive medical expense of $34.01 deducted in *101 the return but not paid during the year * * * and disallowance of $129.98 by reason of the limitations applicable to payments for medicine * * *. Respondent determined that the payment of $4,200 received by petitioner in 1955 from the Urbandale Coal & Acreage Company "is ordinary income and is not subject to the provisions of section 1303 of the Internal Revenue Code of 1954." Respondent also determined that the gains realized by petitioner from the payment on his trustee's certificates in 1955 and 1956 were taxable as ordinary income. Opinion The first issue is whether section 1301[2] *103 applies to the $4,200 received by petitioner in 1955 from the Urbandale Coal & Acreage Company. [3] Respondent argues that petitioner's services for the coal corporation were either (1) part of his overall efforts as executor and trustee to conserve the assets of the Merritt estate, or (2) a separate undertaking to perform general services in the employment of an operating corporation. If the first interpretation is true, the respondent argues that the $4,200 payment in 1955 fails to meet the 80 percent test of section 1301 because petitioner had been paid trustee and executor fees from 1928 through 1945 *102 of about $12,600, plus an interest in certain property. If the second interpretation is true, then respondent contends that the services of petitioner for the coal corporation do not come within the definition of "an employment" within the meaning of section 1301. Petitioner contends that the $4,200 was not paid to him as a part of his overall compensation for services performed for the Merritt estate or for the benefit of beneficiaries or creditors of that estate or for trustees holding assets of that estate. He contends the payment was made by the corporation for services he performed for the corporation as president and director during 21 years of its corporate existence. Without reviewing the evidence, we will accept petitioner's contention and this means the statute is applicable if, in performing such services as president and director of the corporation, he was engaged in "an employment" *104 as that term is defined in the statute. Section 1301(b), as here applicable, defines the term as meaning "an arrangement * * * for the performance of personal services * * * to effect a particular result * * *" In his regulations the Commissioner has, we think, correctly pointed out that "an arrangement to perform general services is not an employment within the meaning of section 1301 either as to any particular project on which services are performed or as to the general services since there is no understanding that the services are to accomplish a particular result." Section 1.1301-2(b), Income Tax Regs. The question of whether "an employment" within the meaning of the statute exists is one of fact and the Commissioner's regulation states that "[the] primary factor in making such a determination is what the particular profession, business, or industry would normally consider as a distinct project or result." Section 1.1301-2(b)(ii), Income Tax Regs.
Would engagement to serve as president and director of an operating corporation be normally considered by business or industry as engagement in a distinct project to effect a particular result as distinguished from general employment *105 to render general services for the corporation? We think not. When we consider the particular facts and circumstances surrounding the employment contract in this case or the understanding of the parties to see if there was engagement to effect a particular result (Sec. 1.1301-2(b)(ii)), we reach the same conclusion. We find nothing in the record to indicate petitioner was engaged to render, or that he performed, services for the corporation beyond the normal duties of president and director of an operating company. The corporate minutes that authorized the payment to the two officers recite the payment is "for their services as directors, and their services in attending board meetings and committee meetings, and other incidental work connected with the management of said corporation." The $4,200 was paid to petitioner for services that were performed in prior years but this statute is not applicable when the employment was general and not designed to effect a particular result. [4] *106 We hold for respondent on the issue. The $4,200 was fully taxable in the year of receipt. The next issue is whether the gains realized by petitioner in 1955 and 1956 from the retirement of the two trustee's certificates held by him are taxable as capital gains or ordinary income. The trustee arrangement executed in 1930 was in the nature of an assignment for the benefit of the major creditors of the Merritt estate. The trusteebank held the stock in the Urbandale Coal & Acreage Company as security for the claims of the creditors who each received a trust certificate representing a proportional interest in the trust. Petitioner purchased two of these trustee's certificates in April 1954, one representing a.4666 interest for the sum of $2,500, the other representing a.0384 interest for $150. He received payments of $8,258 in 1955 and $13,334.41 in 1956 from the trusteebank to be applied to the two certificates. These payments were made in the liquidation of the trust. These trustee certificates *107 were nothing more than evidences of indebtedness. In the trust agreement executed in 1930 these instruments are referred to throughout as "notes." In fact, the trustee certificates themselves do not purport to do anything more than represent outstanding claims, as the following excerpt from one of the certificates purchased by petitioner shows: This certificate represents a claim of $12,923.92, which sum is to draw interest at the rate of 6% per annum to be computed March 1st and September 1st of each year and all of that portion of the sums paid by the trustee on said dates in excess of the interest then due shall be endorsed upon the principal of said claim and when said interest and principal have been paid in full through the disbursements of said trustee, then this certificate shall have no more value. To obtain capital gains treatment for a realized gain there must be, in addition to other requirements, a "sale or exchange." Section 1222. The payments which petitioner received in 1955 and 1956 were not payments received in any sale transaction of his trust certificates. They were payments made by the trustee-bank in accordance with the terms of the trust obligation. It can be *108 conceded that the trust certificates were capital assets in the hands of petitioner and that he held them more than 6 months. But the sums he received from the trustee-bank were not received as the result of any sale or exchange of the certificates. See Ogilvie v. Commissioner, 216 F. 2d 748, affirming 20 T.C. 734; Pat N. Fahey, 16 T.C. 105; Lee v. Commissioner, 119 F. 2d 946, affirming 42 B.T.A. 920, and Samuel Towers, 24 T.C. 199, affirmed 247 F. 2d 233. Moreover, it appears that the total payments on the trustee's certificates since 1931 went for the most part to meet the interest on the outstanding claims. Originally, the claims represented by the certificates totaled $25,570.70 and that although the total payments to the certificate holders from 1931 through January 16, 1956 (the date of final payment) totaled $58,296.03, the total debt still outstanding as of January 16, 1956 was $27,018.71. It would seem then that the payments to the certificate holders, including petitioner, largely represent interest payments. We hold for the respondent on this issue. The next issue involves the amount of automobile expenses deductible by petitioner as a business expense. Section 162(a). *109 Petitioner estimated that he used his car in each of the years 1955 and 1956 for business purposes 75 percent of the time and claimed deductions in his returns for those years of $2,987.09 and $2,068.63, respectively. Respondent disallowed a portion of these deductions for both years on the ground that petitioner used his car only 25 percent of the time for business purposes. Petitioner, of course, has the burden of proving that he used his car for business purposes more than 25 percent of the time. Petitioner testified that he "managed and owned six farms at the time either partially or totally" and that he "looked after them." These farms and their income-producing operations appear in his returns for these years. Petitioner also testified that his law practice "largely covered the area outside Fort Dodge trying cases for other lawyers." He testified that he "looked after" certain "cement or stucco-gypsum ventures" as "the local, resident person." There was testimony that he lived within two blocks of the main section of Fort Dodge and that his children went to a school within two blocks from his home, which tends to indicate a lessened use of the car for personal reasons. On the *110 other hand, he also testified that he went on vacations in both years "practically all summer" to Montana, several southern states, and Canada. We cannot, with the evidence at hand, arrive at any division of unerring accuracy between the business and non-business uses of the car by petitioner in these years. We are persuaded, however, that petitioner's varied business enterprises called for the use of his car more than 25 percent of the time. On the basis of the entire record we hold that petitioner used his car for business purposes 60 percent of the time in each of the years 1955 and 1956. Certain changes in the method of computing depreciation, which do not appear to be disputed, and other arithmetical changes can be given effect in the Rule 50 computation. The last issue is whether respondent correctly disallowed a portion of the medical deductions claimed by petitioner in 1955 and 1956. Respondent disallowed 60 percent of the premiums paid by petitioner on three insurance policies in 1955 and four in 1956. Two of the policies in effect in 1955 provided for accident and sickness benefits, while the third policy provided for hospitalization benefits. The same three policies were *111 in effect in 1956 and a fourth policy provided for hospitalization benefits as well as accident or sickness benefits. We have made detailed findings as to the explicit coverage provided by these policies and generally they provide indemnities for accidental loss of life, limb, sight and hearing, hospitalization and surgical costs, and for loss of time caused by accidents or illness. In Donald G. Kilgore, 38 T.C. - (June 11, 1962), we held that "amounts paid for health or accident insurance are deductible as expenses for medical care under section 213 of the Internal Revenue Code of 1954." We can perceive no distinction between the accident and health policies involved in that case and those involved here. We regard the Kilgore case as controlling here. Two of the policies (Nos. 858437 and H 48062) provided benefits for petitioner, his wife and their three minor children. Petitioner was over 65 years of age in 1955 and 1956 and, therefore, the amounts paid as premiums on these policies for petitioner and his wife are not subject to the statutory limitation of 3 percent of the adjusted gross income. However, the portion of the premiums which pertain to the three minor children do come *112 under this limitation. Section 213(a)(2). We hold that, subject to the 3 percent limitation for the premium paid for the children on two of the policies, the amounts (which have been stipulated) paid by petitioner in 1955 and 1956 on the policies in question are deductible as medical expenses under section 213. It does not appear that the disallowance in 1955 of a premium of $37.50 paid by petitioner on a comprehensive personal liability policy is disputed and in any event it is clearly not within the rationale of the Kilgore case. We sustain respondent on this item. Respondent also disallowed an item of $34.01 in 1956 as "not paid during the year." At the time the respondent stipulated that this item was paid. Petitioner, however, testified that "I rather think it was [for] the children. I am not sure." We hold that this amount is subject to the statutory limitation for medical expenditures of 3 percent of adjusted gross income. Decision will be entered under Rule 50. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.↩
2. SEC. 1301. COMPENSATION FROM AN EMPLOYMENT. (a) Limitation on Tax. - If an individual or partnership - (1) engages in an employment as defined in subsection (b); and (2) the employment covers a period of 36 months or more (from the beginning to the completion of such employment); and (3) the gross compensation from the employment received or accrued in the taxable year of the individual or partnership is not less than 80 percent of the total compensation from such employment, then the tax attributable to any part of the compensation which is included in the gross income of any individual shall not be greater than the aggregate of the taxes attributable to such part had it been included in the gross income of such individual ratably over that part of the period which precedes the date of such receipt or accrual. (b) Definition of an Employment. - For purposes of this section, the term "an employment" means an arrangement or series of arrangements for the performance of personal services by an individual or partnership to effect a particular result, regardless of the number of sources from which compensation therefor is obtained. 3. Although petitioner specifically claimed the benefit of section 1301 in his 1955 income tax return, the respondent in his notice of deficiency, did not mention section 1301 but stated that section 1303 was not applicable. However, in the petition and answer the parties indicate that the issue as to this item is the applicability of section 1301↩.
4. Ordinarily salary or compensation for personal services is taxable in the year of receipt even though services were performed in prior years. Section 1303 gives some tax relief for back pay received in a taxable year when payment of compensation is delayed by bankruptcy of employer or some similar event. Here petitioner testified the corporation was solvent and he does not argue section 1303↩ is applicable.